CRAIN, Judge.
This is a tort suit by Carla Dougay for personal injuries allegedly received by her as the result of negligence of Seventh Ward Hospital (SWH) and one of its employees. Her husband, Gary Dougay, claims loss of consortium. From a judgment against SWH in its favor, SWH appeals. The only assignment of error is that the trial court’s judgment ignores “objective evidence of the collusive fraudulent testimony of all the plaintiffs’ witnesses” and “irreconcilable conflicts, inconsistencies and suspicious circumstances inherent in the plaintiffs’ case” allowing recovery of damages for an incident that never occurred.
It is Carla Dougay’s contention that she was admitted to Seventh Ward Hospital on September 21,1989, to deliver a baby. Her physician was Dr. J.C. Hess. The baby was born on September 21, 1989. On the night of the 22nd, around 8:30 p.m., her brother brought a hamburger to her room. She, her brother, her husband and her stepson were present. She ate the hamburger and needed to go to the bathroom. She buzzed the nurse for medication anticipating needing it after getting up and going to the bathroom. The nurse advised her she would bring it. A sink was located on the wall next to the bathroom door outside the bathroom. The way the room was constructed, if the bathroom door was standing open and the door leading in and out of the room was opened, it would hit the bathroom door. While Carla Dougay was standing in the bathroom doorway using the sink, the nurse suddenly opened the room door causing it to hit the bathroom door, in turn causing the bathroom door to close and strike Carla Dougay in the back. The blow allegedly injured Carla’s back resulting in a ruptured disc.
To prove her allegations, plaintiff called as a witness her brother, David MeCrory, who related the above sequence of events. He stated that when the door hit his sister in the back she started crying and screaming with pain. Her husband had been lying on the couch. He got up and helped Carla into the bathroom. When they closed the bathroom door, MeCrory was able to open the outside door. When he did so he saw Nurse Beverly Roddy outside with some aspirin for Carla. He identified nurse Rod-dy in court as being the nurse outside the door. When he opened the door he was mad and he told Nurse Roddy, “I’ll have you know when you opened that god damned door, you hit her in the back.” At that point he called her a “F’ing bitch.” Nurse Roddy said she would come back with some medication. She did not come back with the medication so he went to the nurses’ station and told her to bring Carla medication. She did and when she got back to the room Carla told her that the door had hit her in the back. Nurse Roddy apologized, gave Carla the medication and left.
Mr. MeCrory admitted on cross-examination that he did not relate cursing Nurse Roddy when he gave his deposition, and that in trying to identify the nurse, he described her differently than she actually appears. But, he asserts that when he saw her, he knew her. He further denied that Carla had any further accidents.
*1086 Gary Dougay, Carla’s husband testified that he arrived at the hospital around 6:30 to 7:00 p.m. on September 22nd. Beverly Roddy came in around 7:00 p.m. and introduced herself as the nurse on duty. He lay down on the couch and was dozing. He remembers his brother-in-law coming in. The next thing he remembers was Carla at the sink “hollering and screaming.” She told him she had been hit by the door. Later Carla and David confronted Nurse Roddy about the door and she apologized. He was unaware of Carla’s having back problems other than from the accident.
Gary Dougay drove his wife to the emergency room of SWH on November 16,1989. She went because she was having a lot of back pain and they had called Dr. Hess who suggested the emergency room. Carla reported the history of her back problem to the nurse.
On cross-examination Gary Dougay testified that he called the hospital and reported the back incident two or three days after it occurred. He denied his wife had back trauma after being in the hospital.
Carla Dougay testified in her own behalf. She stated she had never received a back injury prior to September 22, 1989. Dr. Hess was her obstetrician during her second pregnancy. The only back pain she suffered prior to the accident was gynecological in nature.
The first time she saw Nurse Roddy was the night of September 22, 1989, when the nurse came by and told her she was the duty nurse. When Carla got up to go to the bathroom that night her husband, brother and stepson were present. She called the nursing station and told them she would be needing something for pain. She spoke to Nurse Roddy. Her brother helped her out of the bed. She went into the bathroom and got a bottle to fill with warm water. She was standing in the bathroom door filling the water bottle from the sink when the outside door opened striking the bathroom door causing it to hit her in the back. She was pinned between the door and the sink and she screamed. She did not see Nurse Roddy then, but heard her brother talking to her and recognized her voice. Later the nurse came in with some medication and apologized for having hit her in the back. The medication she was taking for her other problems at the time eased her back pain. She took it for granted the accident had been reported. She saw Dr. Hess on the morning of the 23rd when he made his rounds. She told him then she had been struck in the back. She took it for granted that he recorded it. After discharge, she had a minor infection. Dr. Hess prescribed medication, which also relieved the back pain, but she was having back problems.
Since the accident she has sought medical attention for her back problems. On November 16, 1989, she went to SWH emergency room at the instruction of Dr. Hess, and was seen by Dr. Merlin H. Allen. She had not moved any furniture prior to her hospital visit. She told the nurse at the emergency room her back pain was related to the door incident. She related the same history to Dr. Allen. He prescribed some medication which did not help. At the direction of Dr. Hess she went to see Dr. Famborough on November 29, 1989. He prescribed medication.
She continued to “hurt real bad” and on December 7, 1989, she went to see a Dr. Dunn. A friend recommended her to Dr. David M. Jarroth and she went to see him on January 18,1990. She had a MRI at his request. She went back to Dr. Dunn on April 3, 1990, and to Dr. Jarroth again on April 19, 1990. To have somebody local she went to Dr. Anthony Ioppolo in May of 1990. He recommended a myelogram in July of 1990. She went back to Dr. Jarroth and had another MRI done at SWH on April 3, 1991. Her last visit to Dr. Jarroth was June 10, 1991.
On cross-examination Carla denied 'having back trauma after the September 22, 1989 incident. She admitted she, like her brother, had also described Nurse Roddy as having white hair with a little black and having gold rim glasses, but that was before she saw photographs and recognized her. Her husband called the hospital several days after the accident to see if it was reported because her grandmother kept *1087 telling her she needed to find out. In May of 1991, she did have some trauma as a result of her husband’s pushing her around some. She had a couple of knots on her head and a sore ankle. She did file a petition for a protective order from her husband in the 21st Judicial District Court on May 21, 1991. She related in the petition that her husband attacked her on May 15, 1991, bruising her ribs, chipping a bone in her nose, bruising her left kidney causing blood in her urine and spraining her left ankle. She also related that her husband had physically attacked her on March 11, 1990, causing head, neck and back injuries. She did not tell any doctor about the March 11, 1990 injuries.
Dr. Hess testified by deposition. He performed the cesarean section on the morning of September 21, 1989. He made progress notes for September 23, the day of discharge when he made morning rounds and after the afternoon rounds. He discharged Carla on the afternoon of the 23rd. He made no notation that on the 23rd she complained of a back injury and he has no independent recollection that he was told. He presumes if the incident had been reported to him he would have written it down. If he had known there was a hospital injury to one of his patients, he would have written it down. After discharge his notes reflect Carla called him and complained of back pain. He called in a prescription for an antibiotic since she also complained of increased temperature. His notes do not reflect the date. The next date he noted a contact was made September 28, 1989. That was probably the day he removed the stitches. He notes no problem at that time. In neither the call nor the 28th office visit did he note that the back complaint stemmed from other than the gynecological problems. His notes do not indicate any trauma. In fact, on the 28th his notes do not reflect a complaint of back pain. He followed her up again on October 2,1989, and she had no complaints. On October 9, he got a telephone call. He noted that the patient called and complained of bleeding while moving furniture. He has no recollection that she ever reported a back trauma to him and his notes do not reflect any such complaint. He would probably have written down anything significant.
The next time he saw Carla was November 17, 1989. She complained of back pain and had apparently been to the emergency room of SWH and seen Dr. Allen the day before. Allen’s notes refer to prior back trauma. Dr. Hess concerned himself only with the gynecological problems for which he continued to see Carla through June 20, 1990. She transferred her records on January 7, 1991.
Dr. Merlin H. Allen testified at trial. He is a family practitioner. He saw Carla Dougay first on November 16, 1989, when she came into the emergency room of SWH complaining to the screening nurse of pelvic and low back pain. From the background he had concluded that he would be dealing with a pelvic problem when suddenly she told him that she had been struck in the back by a door. She didn’t tell him when it occurred and he assumed since he was seeing her in the emergency room it was of recent origin even that day. He didn’t do a pelvic because she felt as though she needed a back x-ray more than a pelvic. He examined her back and found tenderness in the area of L3, L4 with par-aspinous muscle tenderness that you could see and feel. He saw no visible evidence of a bruise. The x-rays indicated a transitional fifth vertebra that she was born with. It makes a person vulnerable to having a disc problem in that area. He diagnosed an acute lumbar sacral strain or a bruise.
Dr. David M. Jarrott testified by deposition. He is a neurosurgeon and first examined Carla on January 18, 1990. She complained of lower back pain, and left leg pain with tingling in the left foot related by her to having been struck in the back by a door at SWH. He diagnosed lumbar neuralgia or nerve irritation and recommended an MRI. She had the MRI on January 31, 1990, and saw him again on April 19, 1990, with films and the report of the scan performed at SWH. They showed desiccation or drying up of the L5-L6 disc with abnormal bulging indicative of a disc abnormality. She was put on motrin, valium and *1088 exercises. She came back March 26, 1991. He suggested a current MRI which was performed at SWH on April 3, 1991. The results were the same with perhaps less bulging. He saw her last on June 10,1991, and made a final diagnosis of chronic disc rupture, L4-5, with surgery a consideration because conservative efforts had not rehabilitated. He found no nerve root impingement except for the spasm, so the symptoms are subjective. He gave the etiology of her back problem as trauma because that is the history she gave. The etiology could be gynecological. However, his findings are compatible with a history of trauma. Assuming the door incident, it is more probable than not that the incident caused the problem. He would not expect her to wait four weeks for treatment after the trauma but the post delivery medications for pain could mask the problem.
Dr. Anthony Ioppolo testified by deposition. He is a neurosurgeon who first saw Carla on May 29, 1990. His examination of the MRI previously done showed a degenerative disc at L5, protruding but not impinging on the nerve. Because of that he recommended physical therapy. She returned on July 24, 1990. Physical therapy and medication had not helped. He recommended a myelogram and a post myelo-graphic CT scan. These were performed on July 26, 1990. They revealed the transitional L5 (six vertebrae rather than the normal five) and bulging at L5. There was no evidence of nerve root impingement. He recommended a corset. On September 25, 1990, Carla returned somewhat improved from the corset but still in pain. She was last seen by him on November 20, 1990, when she seemed better and he instructed her to return on an “as needed” basis. He bases the etiology as the trauma because of her description of the accident and the onset of symptoms. Additionally, it is compatible with trauma since there is no generalized degeneration.
Summarizing plaintiff's case, Carla Dougay has a bulging disc that is probably not impinging on a nerve at this time. The doctors would relate the problem to the trauma she suffered as a result of being hit in the back by the door knob if that incident did, in fact, occur and there was no other trauma.
Defendant, SWH, called as a witness Beverly Roddy. She has no independent knowledge of caring for Carla Dougay during her hospitalization of September 21-23, 1989. She was working the 7:00 p.m.-7:00 a.m. shift on September 22, and was assigned the Dougay room. She has her chart notes from that night. She checked on Carla Dougay at 7:30 p.m. and her notes indicate she found her doing well. Her next entry is at 9:00 p.m. That entry indicates Carla was walking to the bathroom and voiding well, with a complaint of abdominal pain. At 9:30 p.m. her notes indicate Percocet for pain and that there were family members present. There was no notation of anything unusual in the notes, nor did she recall anything unusual. At 11:00 p.m. her notes indicate no complaints. At midnight Carla was sleeping and there were no complaints. At 2:00 a.m. and 4:00 a.m. she was still sleeping. Nurse Roddy’s 6:00 a.m. notes indicate Carla had some pain and was given a Percocet. After 6:00 a.m. she had no further contact with the patient. There was no record in her notes of an incident involving a door and no record of complaints of back pain. The hospital furnishes a form for incident reports. That form is due at the nursing office within 24 hours of any incident or unusual occurrence. Nursing personnel are encouraged to fill out these reports and she would not hesitate to do so. Reports are filled out for less serious incidents than the one alleged by the Dougays. There was no incident report on this alleged accident. She has never had long hair, her hair is not silver and has never been dyed, and she has not worn gold rimmed glasses. She does not recall any of the conversations related by the Dougays or McDowell. The hospital notes indicated that she was the only hospital personnel to enter the Dougay room that night.
Nurse Roddy’s 9:00 p.m. notes indicate “ambulating to bathroom” rather than “stated ambulatory to bathroom.” This could indicate that at that time Carla Dou-gay was out of bed going to the bathroom.
*1089 The deposition of Mark Letard was introduced. He is a staff nurse for SWH assigned to the intensive care unit. He was a nursing supervisor and as such, familiar with the rules and regulations regarding reporting of accidents and incidents. He knows of no incident report filled out with reference to Carla Dougay.
We agree that there are deficiencies in plaintiffs’ case that would have justified the trial court in rejecting plaintiffs’ demands. Among the most significant is the fact that the Dougays claim an incident and circumstances surrounding it that are entirely denied by the nurse who allegedly caused the injury. In addition, an incident of this significance which is claimed to have been reported to the attending physician was, in fact, not noted by that physician to have been reported to him at all. There is also the fact that Carla Dougay denied under oath having other traumas to her back. However, in a judicial proceeding for a protective order, she alleges other trauma as a result of physical abuse by her husband.
Still the only objective evidence in the case is that Carla Dougay does have a bulging disc. This injury was definitively diagnosed as early as April 19, 1990, and at that point Carla Dougay had been seeking medical attention for back complaints for six months. The MRI upon which the bulging disc diagnosis was made was performed on January 31, 1990. The first incident with her husband is not alleged to have occurred until March of 1990. Consequently, the trial court would have to believe that since Carla Dougay lied about having trauma to her back other than from the hospital incident, she also lied about not having suffered that trauma prior to March of 1990. The trial court refused to draw that conclusion and instead gave credence to the hospital incident as having caused the back trauma based upon his determination of the credibility of the witnesses. The trial court was entitled to make that determination. See, Holmes v. Southeastern Fidelity Insurance Co., 422 So.2d 1200 (La.App. 1st Cir.1982), writs denied, 429 So.2d 133 (La.1983).
The consensus view of this court is that sitting as a trier of fact we would have dismissed plaintiffs’ case. However, Rosell v. ESCO, 549 So.2d 840 (La.1989) admonishes that when objective evidence does not contradict, or the story is not so internally inconsistent or implausible that it could not be credited, a fact finder’s finding based on credibility can virtually never be manifestly erroneous or clearly wrong. Under this restriction we cannot base a reversal on manifest error in this case. Consequently the judgment of the trial is affirmed at appellant’s cost.
AFFIRMED.